2024 IL App (1st) 240307-U

FIRST DIVISION
April 22, 2024

No. 1-24-0307B

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 0993101 |
| | ) | |
| MAURICE MYERS, | ) | Honorable |
| | ) | Nicholas Kantas, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court did not abuse its discretion in denying pretrial release.

¶ 2   The defendant-appellant, Maurice Myers, appeals from the circuit court's January 31, 2024 order, granting the State's petition for denial of his pretrial release pursuant to section 110-6.1(a) of the Code of Criminal Procedure of 1963 (Code) as recently amended by Public Acts 101-652, § 10-255 and 102-1104, § 70 (eff. Jan. 1, 2023) (725 ILCS 5/110-6.1(a)(1), (6) (West 2022)), and

commonly referred to as "the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act" or the "Pretrial Fairness Act" (Act). See also Ill. S. Ct. R. 604(h) (eff. Oct. 19, 2023); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023). On appeal, the defendant contends that the State failed to prove by clear and convincing evidence that no conditions of release could mitigate the risk of his threat to the safety of the community, so as to justify his pretrial detention. The defendant further asserts that the circuit court erred by failing to make a written finding summarizing its reasons for concluding that there were no such mitigating conditions and that he should be denied pretrial release. For the following reasons, we affirm.

¶ 3                                    II. BACKGOUND

¶ 4      On June 22, 2019, together with codefendant Kirby Brame, the defendant was charged with: (1) first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)); (2) aggravated battery (720 ILCS 5/12-3.05(1) (West 2018)); and (3) aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)) for his involvement in the shooting of two victims in the 3900 block of West Lexington Street in Chicago. On that same day, a bond hearing was held, after which the defendant was taken into mandatory pretrial custody.[1]

¶ 5      After the subsequent amendments to the Act, the defendant filed a petition for pretrial release pursuant to section 110-6.1 (725 ILCS 5/110-6.1 (West 2022) asserting that there were conditions available to balance the safety of the community with his freedom. The defendant alleged that he was only 22 years old when he was arrested for the instant crime, and that he had

---

[1] It is unclear from the record whether at this point bail was set or denied or whether any subsequent motions for modification of bail were made. All that is apparent is that the defendant remained in custody for the next three years.

no prior violent convictions or juvenile adjudications. In addition, the petitioner asserted that he had several ties to the community including his mother, Latoya Davis, who would allow him to stay at her home on electronic monitoring and would ensure his appearance at every court hearing.

¶ 6    On January 31, 2024, the State filed a verified petition seeking to deny the defendant's pretrial release pursuant to sections 110-2, and 110-6.1(a)(1), (a)(1.5) of the Act (725 ILCS 5/110-2, 110-6.1(a)(1), (a)(1.5) (West 2022)), alleging that the defendant was being charged with a non-probationable forcible felony and that his pretrial release posed a real and present threat to the safety of the community. The State further asserted that based on the specific and articulable facts of that case, no condition or combination of conditions that the court could impose would mitigate the risk of that threat.

¶ 7    On January 31, 2024, together with codefendant Brame, the defendant appeared in court for a hearing on the two petitions.

¶ 8    At that hearing, defense counsel stated that she would rest on her motion for pretrial release. In addition, she added that the defendant was 26-year-old and had no prior felony background. Defense counsel also pointed out that the defendant had a lot of family in the area, including his mother and several siblings, and that at the time of his arrest he was living with his mother and working as a temporary assembly-line worker for MVP Workforce. Counsel also noted that the defendant's father, who lives in San Diego, was very "active" and "involved" in the defendant's defense.

¶ 9    In response, and in support of its petition seeking pretrial detention, the State proffered that at around 6 p.m. on June 22, 2019, the defendant retrieved a gun from codefendant Brame, and then proceeded to 3900 West Lexington Street, where he opened fire, striking two victims and killing one.

¶ 10    According to the State, earlier that afternoon, the defendant was inside a Boost Mobile cell phone store, located near West Lexington Street and South Pulaski Road, together with codefendant Brame, who worked there as a clerk, and two other witnesses. The defendant left the store for a period of time, then returned and informed codefendant Brame that he had just been robbed "by a group of people known to the area." The defendant then instructed codefendant Brame to retrieve a gun. Codefendant Brame went to the back of the store, and returned moments later with a zipped bag, from which he removed a firearm. The defendant took the firearm and began to leave the store. Codefendant Brame then suggested that the defendant wear a hoodie to cover the gun. The defendant retrieved a hoodie, which was too small and then selected a larger one, which he put on and used to cover the firearm before leaving the store.

¶ 11    The State further proffered that the defendant next met up with another individual, who was eventually charged with possession of a controlled substance (hereinafter the PCS codefendant). The two of them then walked towards the 3900 block of West Lexington Street. Standing on the corner of Pulaski Road, and facing east onto Lexington Street, the defendant opened fire on the people that he believed to be responsible for the robbery. After these unknown individuals returned fire, the defendant ran back to the Boost Mobile store, where he informed the occupants of his actions. Codefendant Brame took the gun from the defendant and the two went to the back of the store.

¶ 12    The PCS codefendant then entered the store irate and began calling the defendant names before proceeding to the back of the store with him. Codefendant Brame then emptied the store of all occupants except for the defendant, the PCS codefendant, and another witness and a baby that was inside a car seat on top of the counter. The four men then went to the back of the store and hid. After a while, codefendant Brame returned to the front of the store to speak with the police.

Codefendant Brame blocked the officers' access to the store and told them that no one was inside. However, the police were able to contact the store owner and eventually gained access from the back alley.

¶ 13    The police detained all of the individuals inside the store, and recovered two guns, two hoodies and video evidence.

¶ 14    The State further proffered that there were two victims to the shooting, neither of whom were directly linked the alleged robbing of the defendant. The first was shot in the head and subsequently died at the hospital. The second was shot in the buttocks and had to have a portion of his colon removed.

¶ 15    The State also proffered that the surviving victim and his brother-in-law both reported hearing gunfire from the direction of Pulaski Road and returning fire coming down Lexington Street and shooting westbound. The police recovered five shells matching the caliber of firearm, which was allegedly used by the defendant.

¶ 16    The State also proffered that the defendant was identified as the shooter by way of his clothing. Specifically, after the police received a call indicating that the shooter had run into the Boost Mobile store wearing a white tank top, they discovered the defendant in the back of that store wearing a white tank top and sweating profusely. In addition, the State proffered that both the defendant and codefendant Brame gave statements to the police which were electronically recorded.

¶ 17    The State next published a series of ten video clips, which supported its proffered evidence and which it described in the following manner.[2]

---

[2] The video clips were not impounded and are not part of the record before us. However, for purposes of this appeal, both parties agree that the State's description of their content is accurate.

¶ 18    Exhibit 1 shows the defendant, who is wearing a white tank top, running into Boost Mobile, and approaching codefendant Brame, who is standing behind the counter. Codefendant Brame then rushes to the back of the store and returns with a fanny type bag, which he unzips for the defendant.

¶ 19    Exhibit 2 shows codefendant Brame pointing to a hoodie, which is on the window ledge next to where the defendant is putting on another hoodie. Codefendant Brame picks up a white shirt, hands it to the defendant and then takes it back, while they speak. The defendant then puts his hoodie up over his head and exits the store.

¶ 20    Exhibit 3 shows the defendant reaching near his mid-section with his right hand while exiting the Boost Mobile store, and then turning left along the wall, while holding his hands inside his hoodie pocket.

¶ 21    Exhibit 4, which is a cell phone or surveillance video, shows the defendant running with his arms outstretched and "pops of fire as he runs."

¶ 22    Exhibit 5 begins with codefendant Brame sitting on the counter inside Boost Mobile. The defendant approaches and passes him a silver handgun, which codefendant Brame "casually or nonchalantly accepts *** without surprise," before "they both head to the back room."

¶ 23    Exhibit 6 shows the PCS codefendant entering the Boost Mobile store.

¶ 24    Exhibit 7 shows the defendant, codefendant Brame, and two other individuals in the back of the store. Codefendant Brame is heard saying "Ain't nobody trying to go to jail," to which the defendant replies, "I'm already going to jail."

¶ 25    Exhibit 9[3] shows the same four men at the back of the store and reveals codefendant Brame stating something along the lines "I put a pipe in your hand."

¶ 26    Exhibit 10, which is part of the defendant's electronically recorded interview with the

_____

[3] There was no Exhibit 8 introduced into evidence.

police, shows him stating that he was shot at first.

¶ 27    Exhibit 11, which is part of codefendant Brame's electronically recorded interview with the police, reveals him saying that he gave the defendant the gun.

¶ 28    After introducing the video evidence, the State pointed out that the defendant has three new pending charges, namely two felony charges for possession of contraband in a penal institution and aggravated battery of a correctional officer, and one misdemeanor charge for mob action. The State indicated that it had video clip evidence of the defendant's behavior while in jail but ultimately did not present it to the court.

¶ 29    The State then discussed the defendant's prior criminal background, noting that it included five misdemeanor convictions, namely: (1) a 2019 criminal trespass to land conviction for which he received 50 days in Cook County jail; (2) a 2019 attempt possession of a controlled substance conviction, which was reduced from a Class 4 felony, and for which he received two days in jail; (3) a 2018 criminal trespass to land conviction for which he received two days in jail; (4) a 2017 criminal trespass to land conviction for which he received two days in jail; and (5) a 2015 possession of cannabis conviction.

¶ 30    After hearing all the evidence, the circuit court first found that the State met its burden in proving by clear and convincing evidence that the defendant committed the charged offenses. The court observed that the State's proffered evidence regarding the defendant shooting into a crowd of people was corroborated by the video evidence, which showed, *inter alia*, the defendant leaving the cell phone store after having retrieved a gun from codefendant Brame and then running back inside after the shooting. The court further pointed out that the defendant was arrested almost immediately after the shooting wearing clothes similar to those he wore immediately prior to the shooting.

¶ 31    The circuit court next found that the defendant posed a real and immediate threat to the safety of the witnesses and the community. The court noted that the shooting occurred in the early evening hours of June with multiple citizens present, and that it resulted in the death of one victim and serious injuries to the other. As the court stated:

> "I cannot stress more how dangerous it was to be shooting a loaded gun on the streets of Chicago at 6 o'clock in summer, nothing is more evident to that than the fact that two people were shot, one person was killed."

The court also found relevant that according to the video evidence the defendant did not seem "too concerned" about what he had done. In addition, the video evidence showed him "putting on different clothes, then taking them off, all of those things lend[ing] itself to his attempt to evade and not get caught."

¶ 32    The circuit court next found, that despite the mitigating evidence offered by defense counsel, which it had considered, there was no condition beyond detention that could mitigate the defendant's real and present threat to the community "based on the egregious nature of the facts of this case."

¶ 33    Accordingly, the circuit court granted the State's petition and ordered that the defendant be detained pretrial. The defendant now appeals. See Ill. S. Ct. R. 604(h) (eff. Oct. 19, 2023).

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, the defendant argues that the State failed to prove by clear and convincing evidence that there were no conditions that could mitigate the risk of threat that he posed to the safety of the community. In addition, he asserts that the circuit court erred in failing to make a written finding summarizing its reason for denying pretrial release, including why less restrictive

conditions would not avoid a real and present threat to the safety of the community. For the following reasons, we disagree with the defendant.

¶ 36    At the outset we set forth the relevant pretrial-release provisions of the new statute. Pursuant to sections 110-2-1(a) and 110-6.1(e) of the Act, all defendants are presumed eligible for pretrial release. 725 ILCS 5/110-2(a), 110-6.1(e) (West 2022). The State may detain an accused if it establishes that the charged offense is eligible for detention and then proves that: (1) the proof is evident or the presumption great that the defendant committed an offense which qualifies him for pretrial detention; (2) the defendant poses a real and present threat to the safety of any specific person or persons or the community, based on the specific articulable facts of the case; and (3) no condition or combination of conditions can mitigate that real and present threat. 725 ILCS 5/110-6.1(e) (West 2022).

¶ 37    The State must prove each and every one of these three elements by clear and convincing evidence. *Id*. Clear and convincing evidence is "that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question." (Internal quotation marks omitted.) *In Re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 12. It "is more than a preponderance but less than is required to convict an individual of a criminal offense." *Id.* If the State fails to carry its burden on any of these three elements, the presumption of release remains, and the detention is unlawful. 725 ILC 5/110-6.1(e) (West 2022).

¶ 38    At present, our courts disagree as to the appropriate standard of review. Some appellate decisions have concluded that all aspects of detention hearings under the Act are subject to abuse of discretion (see *People v. Whitmore*, 2023 IL App (1st) 231807, ¶¶ 18-19; *People v. Inman*, 2023 IL App (4th) 230864, ¶ 11) while others have exclusively utilized the manifest weight of the evidence standard (see *People v. Stock*, 2023 IL App (1st) 231753, ¶ 12; *People v. Rodriguez*, 2023

IL App (3d) 230450, ¶ 8). Other courts have adopted a mixed approach, under which the circuit court's determinations that the State has proved by "clear and convincing evidence" that the defendant committed a qualifying offense, and that he is dangerous, is reviewed for the manifest weight of the evidence, while the ultimate decision regarding detention, or the imposition of conditions of release are subject to abuse of discretion review. See *People v. Parker*, 2024 IL App (1st) 232164, ¶ 50; *People v. Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-36; *People v. Hodge*, 2024 IL App (3d) 230543, ¶ 8; *People v. Vingara*, 2023 IL App (5th) 230698, ¶ 10; *People v. Trottier*, 2023 IL App (2d) 230317, ¶ 13; *People v. Reed*, 2023 IL App (1st) 231834, ¶ 24, 31. Still others have concluded that appeals under the Act should be reviewed *de novo*. See *People v. Battle*, 2023 IL App (1st) 231838, ¶ 18; *Saucedo*, 2024 IL App (1st) 232020 (Ellis, J., specially concurring); see also *People v. Herrera*, 2023 IL App (1st) 231801, ¶¶ 22-24 (declining to decide what standard of review applies, but suggesting that even under *de novo* review, the case could be resolved based on legal error).

¶ 39    While we would affirm the instant detention order under any standard, we agree with the rationale of those decisions that hold that detention orders under the Act should be reviewed for an abuse of discretion. *Whitmore*, 2023 IL App (1st) 231807(B), ¶¶ 18-19; *People v. Inman*, 2023 IL App (4th) 230864, ¶ 11. An abuse of discretion occurs when the circuit court's " 'ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the circuit court.' " *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24 (quoting *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009)); see *People v. Johnson*, 2019 IL App (3d) 190582, ¶ 8. In addition, as the reviewing court, we may not substitute our judgment for that of the circuit court merely because we would have analyzed the appropriate factors differently. *Inman*, 2023 IL App (4th) 230864, ¶ 11.

¶ 40    Turning to the merits of the defendant's contentions, we begin by addressing whether the State proved by clear and convincing evidence that there were no conditions of release that could have mitigated the risk of the defendant's threat to the community. 725 ILCS 5/110-6.1(e) (3) (West 2022). The potential conditions for such release are set forth in section 110-10 of the Act, and provide, among other things, reporting in person, refraining from possessing a firearm, refraining from communicating with particular persons, refraining from going to certain areas, and being under home supervision with or without electronic monitoring. 725 ILCS 6/110-10(b) (West 2022). All of these conditions require that a defendant be able and willing to comply with and respect the government actors and property necessary to enforce them. See People v. Parker, 2024 IL App (1st) 2322275-U, ¶ 44.

¶ 41    In the present case, the defendant contends that the State offered no evidence or discussion regarding why less restrictive means beyond detention could not mitigate the purported risk posed to the community by his pretrial release. In support, the defendant cites *People v. Stock*, 2023 IL App (1st) 231753. For the following reasons, we disagree and find that decision inapposite.

¶ 42    In *Stock*, the appellate court reversed the defendant's detention order because the State failed to present *any* evidence regarding conditions of release and instead relied only on the basic elements of the offense—aggravated battery based on the defendant's alleged firing of a gun at his wife and injuring her as she attempted to remove her belongings from the marital home while seeking a divorce—as the backbone for its argument supporting the defendant's detention. *Id*. This is simply not the case here.

¶ 43    In the present case, the State presented evidence, and not mere conclusory statements, that showed why no less restrictive conditions, and particularly electronic monitoring, sought by the defendant, would mitigate the defendant's risk to the community. After proffering evidence that

the defendant had indiscriminately shot at a crowd of people in the street, killing one person and seriously injuring another, the State presented evidence of the defendant's conduct since his incarceration. According to the State, after his arrest in the instant matter, the defendant was charged with three new offenses related to his behavior while in jail, one of which involved violence against a correctional officer. Thus, unlike in *Stock*, here the State explicitly offered evidence of the defendant's inability to control his behavior and conform to legal requisites even while incarcerated, which would be necessary for his compliance with any conditions of release set by the court.

¶ 44    Having heard this evidence, the circuit court found that despite the mitigating evidence offered by defense counsel, there was no condition of release that could mitigate the defendant's threat to the public based on the "egregious nature of the facts of this case." In articulating those facts, among other things, the court focused on the dangerousness of the defendant's action, and his subsequent lack of concern regarding them. Under this record, we find nothing "arbitrary, fanciful or unreasonable" in the circuit court's assessment. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 45    The defendant nonetheless contends that the circuit court erred when it failed to make a written finding summarizing its reasons for denying pretrial release, including why less restrictive conditions would not avoid a real and present threat to the safety of the community. In this respect, the defendant points out that in its written order, next to the preprinted rubric indicating that it found that no condition or combination of conditions" as set forth in section 110-10(b) of the Act (725 ILCS 5/110-10(b) (West 2022)) could "mitigate the real threat to the safety" of the community, the circuit court merely referenced its prior findings regarding the defendant's dangerousness, *i.e.*, that he had shot at a group of people in the street, killing one and injuring

another. The defendant contends that this conclusory statement was insufficient under the statute. For the following reasons, we disagree.

¶ 46 Under section 110-6.1(h)(1) of the Act, the circuit court must "make a written finding summarizing the court's reasoning for concluding that the defendant should be denied pretrial release, including why less restrictive conditions would not avoid a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, or prevent the defendant's willful flight from prosecution[.]" 725 ILCS 5/110-6.1(h)(1) (West 2022).

¶ 47 In interpreting the scope of the written summary findings requirement of this section of the Act, our courts have repeatedly held that in evaluating the sufficiency of the written order, the circuit court's written findings must be read in conjunction with its oral pronouncement, and that "an explicit and individualized oral ruling may satisfy the requirements" of the statute. *People v. Andino-Acosta*, 2024 IL App (2d) 230463, ¶¶ 15, 19; see also *People v. Castillo*, 2024 IL App (1st) 232315, ¶ 31; *People v. Montano*, 2024 IL App (1st) 232481-U, ¶ 24; *People v. Collins*, 2024 IL App (2d) 230577-U, ¶ 17; *People v. Wells*, 2024 IL App (2d) 230521-U, ¶ 31. The reasoning has been that the purpose of the written findings requirement is to ensure that detention decisions are "based upon specific articulable facts" and are "individualized to each defendant," and "to provide the parties of the reasons for the court's decision and to preserve this reasoning for appellate review." *Andino-Acosta*, 2024 IL App (2d) 230463, ¶ 19; *Collins*, 2024 IL App (2d) 230577-U, ¶ 17; *Wells*, 2024 IL App (2d) 230521-U, ¶ 31. Accordingly, while we strongly prefer that circuit courts summarize their reasons in writing for denying a defendant pretrial release and why less restrictive conditions would not mitigate the threat, oral findings can nevertheless satisfy the requirements of section 110-6.1(h)(1) if those findings are explicit, individualized, and based on

articulable facts presented at the hearing, such that they sufficiently apprise the defendant of the reasons for the court's ruling and allow for appellate review. *Id.* In such situations, remanding the case for the circuit court to write out its correctly transcribed oral reasons does not "serve the interests of justice." *Andino-Acosta,* 2024 IL App (2d) 230463, ¶ 22.

¶ 48    In the present case, we agree with the defendant that the circuit court's written order was conclusory. We nonetheless find that when read together with the circuit court's oral pronouncements, the written order was "sufficient to apprise the defendant of the reasons for [the court's] ruling and to accommodate review under the Act." *Andino-Acosta,* 2024 IL App (2d) 230463, ¶ 22. The transcript of the detention hearing reflects that the circuit court considered the electronic monitoring alternative proposed by defense counsel in her motion for pretrial release, but dismissed it based on its belief that no conditions could avoid a threat to the public. After hearing the specific facts of the case, which revealed that the defendant shot indiscriminately at a crowd of people in the street, in an attempt to avenge himself on those he "believed" had robbed him, consequently killing one victim and seriously injuring another, the court found that based on the "egregious nature of the facts of this case," no condition of release could mitigate the threat to the community posed by the defendant. The court described that threat in the following manner: "I cannot stress more how dangerous it was to be shooting a loaded gun on the streets of Chicago at 6 o'clock in summer, nothing is more evident to that than the fact that two people were shot, one person was killed." A fair reading of the circuit court's oral pronouncement is that no alternative to detention existed that would avoid a threat to the public given the specific facts of that case. Accordingly, we find that the court's oral comments, when read in connection with its written findings, sufficiently articulated "its reasons why less restrictive conditions would not avoid the threat to safety." See *Andino-Acosta*, 2024 IL App (2d) 230463, ¶ 20 (holding that the

circuit court's oral pronouncement was sufficient because it "displayed an analysis of the factors concerning the determination of dangerousness, in accord with section 110-6.1(g) of the Act and articulated [the] reasons why less restrictive conditions would not avoid the threat to safety"); compare with *People v. Martin,* 2023 IL App (4th) 230826, ¶¶ 23-24 (determining that the court's findings "f[ell] short of complying with the 'clear legislative directive' to address less restrictive conditions of release" where the court stated only that "[defendant] needs to be detained" and provided no further detail in its detention order regarding less restrictive conditions of release); *People v. Peralta*, 2023 IL App (1st) 231897-U, ¶ 13 (reversing and remanding where "there is no indication in the court's verbal ruling or written order that it considered less restrictive conditions, let alone an explanation of why less restrictive conditions would not mitigate the threat.")

¶ 49   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 50   Affirmed.